UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANNIE L. FRANKLIN,          )
                           )
        Plaintiff,          )
                           )
v.                          )          CV 00-AR-3478-S
                           )
HEALTHSOUTH CORPORATION,    )
                           )
        Defendant.          )

**ENTERED**

APR 1 9 2002

## MEMORANDUM OPINION

Before the court is a motion for summary judgment filed by defendant, HealthSouth Corporation ("HealthSouth").

Plaintiff, Annie L. Franklin ("Franklin"), instituted this action[1] against her former employer, HealthSouth, on December 4, 2000, asserting claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq.; 42 U.S.C. § 1981; and the Family and Medical Leave Act ("FMLA"). Upon motions by Franklin, the court dismissed with prejudice this action insofar as it asserted claims of race discrimination under Title VII and § 1981 and invoked the Family and Medical Leave Act. Franklin's remaining claims relate to retaliation for her complaints regarding perceived race discrimination.

## I.  STATEMENT OF FACTS

Franklin, an African-American female, began her employment with the Lakeshore Rehabilitation Hospital ("Lakeshore") in 1979,

---

[1] Franklin filed a charge of discrimination with the EEOC on November 10, 1999.  The EEOC issued Franklin a right to sue letter on September 12, 2000.

before HealthSouth acquired ownership of it.  Franklin was hired as a part-time patient care technician in the Transitional Living Unit ("the TL Unit") at Lakeshore.  Franklin was promoted to shift supervisor in the TL Unit in 1988.  In March 1991, she was promoted to the position of Residential Manager of the TL Unit. In 1994, HealthSouth purchased the hospital and the adjoining facilities at Lakeshore.  In this purchase, Franklin's employment was not changed.  Franklin held the Residential Manager position until December 2000, when, according to HealthSouth, she voluntarily retired.

The job description for the Residential Manager provides that her primary responsibilities include "the day to day residential management" of the TL Unit; providing "supervision to all residential staff persons;" and monitoring "client care provided by residential staff persons."  (Franklin's Evidentiary Materials Resp. HealthSouth's Mot. Summ. J., at Tab 8.)  The Residential Manager's responsibility also included "maintaining state domiciliary rules and regulations."  (Id.)  HealthSouth asserts that, as Residential Manager, Franklin's duties partly included managing the technicians, as well as serving as a technician, when necessary to treat and care for the patients. Franklin contends, that, under the job description (and under the work improvement plan discussed *infra*), she was to supervise **all** residential staff persons and that licensed and unlicensed staff

2

persons reported to Franklin.

HealthSouth contends that, in the years following its purchase of the Lakeshore facilities, the health care industry, and patient care in particular, experienced substantial changes and improvements.  Although regulations did not require that the TL Unit be staffed with a licensed nurse, HealthSouth claims that one consequence of the aforementioned changes was the developing need to place a licensed nurse in charge of the TL Unit. Furthermore, nursing regulations prohibited non-licensed individuals, like Franklin, from supervising licensed nurses (i.e., LPN's or RN's) and from administering or dispensing medications.  Additionally, increasing numbers of acute patients were being referred to the TL Unit by physicians, and these patients demanded a higher standard of care.  HealthSouth argues that it reacted to these industry changes, the nursing regulations, and the increasing numbers of acute patients by placing a Nurse Manager over the licensed staff members of the TL Unit.  Lois Boggs ("Boggs") was named as Nurse Manager of the TL Unit, and, according to HealthSouth, she was also named as the person to whom Franklin should report for work.[2]

The placement of Boggs as manager of the licensed employees in the TL Unit did not, according to HealthSouth, alter

---

[2]HealthSouth claims that "even with Boggs overseeing the TL nursing care, there was a growing demand for a full-time RN to be assigned to the [U]nit to oversee the licensed personnel." (HealthSouth's Br. Supp. Summ J., at 3. (parenthetical omitted).)

Franklin's duties to supervise the non-licensed technicians of the TL Unit.  Nonetheless, Franklin believed that she was losing her supervisory responsibilities.  Franklin wrote a letter to Boggs on March 16, 1999 (hereinafter referred to as "the March letter").  In this letter, she stated:

> I am writing this letter to address the issue of not having full capacity of my position, which presents a clear case of discrimination by race and reverse advancement.  This is very evident because I have not been allowed to supervise the white staff, but permitted to supervise the black staff.  Since I am the manager of this department, I should be allowed to supervise both white and black staff alike.
>
> In addition, I have not been allowed to attend meetings regarding [the TL Unit] of which I manage.  It appears that my job is being threatened and I am not allowed to exercise the parameters of my position.

(Franklin's Br. Resp. HealthSouth's Mot. Summ. J., at 3.) According to Franklin's characterization of this letter, it indicated that she felt she was being subjected to racially discriminatory treatment.  HealthSouth disputes Franklin's statement that she was discriminatorily denied permission to supervise the white members of the TL Unit's staff.  HealthSouth argues that Franklin was not permitted to supervise the licensed staff members and that, coincidentally, the majority of the licensed staff members were predominantly white, while most of the unlicensed staff members were black.[3]

---

[3]Because Franklin dismissed her race discrimination claims, the court assumes, without deciding, that this racial pattern does not constitute actionable disparate treatment or disparate impact.

4

Franklin argues that, prior to writing the March letter, she had received favorable evaluations, she had never received any complaints from patients about her performance, and she had never been disciplined by HealthSouth.  She alleges that this state of affairs changed, however, after she wrote the March letter. According to Franklin, HealthSouth began disciplining her for "trivial items," and it retaliated against her for complaining of race discrimination.  She contends that, following the March letter, she "lost the duties and responsibilities of the Residential Manager."  (Franklin's Br. Resp. HealthSouth's Mot. Summ. J., at 4.)  Franklin, relying upon her deposition testimony, argues in her brief:

> [n]ot only did [she] lose the supervision of her staff and her scheduling authority, she also lost her ability to perform evaluations on her staff, perform her payroll responsibilities, perform her admissions responsibilities, and keep up with the daily census. Moreover, after complaining of discrimination, [HealthSouth] assigned [Franklin] to work as a technician.  Even though [Franklin] retained the title of Residential Manager, her job changed dramatically. She testified that "[t]hey hadn't changed it on paper, but they had changed it with duties." [HealthSouth] stripped [Franklin] of her management duties and responsibilities and reassigned said duties and responsibilities to Deborah Acoff, an RN."

(Franklin's Br. Resp. HealthSouth's Mot. Summ. J., at 4-5 (footnotes omitted).)

On March 18, 1999, two days after Franklin wrote the March letter, Terry Brown ("Brown"), the Hospital Administrator, and Debbie Smith ("Smith"), the Human Resources Director, met with

5

Franklin to discuss the issues raised in her letter.  After being
asked to describe her concerns, Franklin stated that she felt she
was only being permitted to supervise black employees and not
white employees. Smith testified that further discussion of
Franklin's complaints revealed that her problems dealt with the
prohibition against Franklin supervising licensed staff members.
The three then discussed the parameters and limits of Franklin's
supervisory authority and the scope of Franklin's job duties in
the TL Unit.  Franklin also expressed her concerns regarding
rumors that her position was in jeopardy; Brown assured Franklin
that the rumors were not true.  Both Brown and Smith agreed to
investigate Franklin's concern that she was not being included in
meetings and decisions relating to the TL Unit, and Brown and
Smith assured Franklin that she would be included in all
appropriate meetings.  Franklin admits that this meeting was a
positive meeting and that all issues raised in her March letter
were resolved or clarified.

Barbara Hayes ("Hayes"), one of two individuals serving as
Director of Patient Care Services during Franklin's tenure at
HealthSouth, met with Franklin on March 19, 1999.  In this
meeting, they reviewed Franklin's job description, clarifying the
scope of Franklin's job duties in the TL Unit.  Hayes also
reiterated to Franklin that nursing regulations authorized her to
supervise only non-licensed technicians.  In April 1999, Smith

6

"followed up with [Franklin] to confirm that all issues had been resolved to her satisfaction.  [Franklin] reported to Smith that 'everything was fine and that [she] had no problems' and she 'had no concerns at this point.'" (HealthSouth's Br. Supp. Summ. J., at 5 (quoting Smith Decl. ¶ 4; Smith Dep. at 73).)

In May 1999, allegations were made against Franklin regarding inappropriate conduct.  Following his discharge from the care of the TL Unit, John Orr ("Orr") frequently visited staff members and patients.  During Orr's visits, he often brought pizzas and desserts that he had purchased for the staff and patients.  In May 1999, Orr complained to the Lakeshore hospital because he asserted that Franklin "would pressure him for money to purportedly purchase the same treats for the other shifts." (HealthSouth's Br. Supp. Summ. J., at 6.)  Orr further claimed that he provided money to Franklin on six occasions, but that Franklin did not use that money for its intended purpose.

In his May 1999 complaint, Orr reported a second problem with Franklin.  He stated that Franklin asked him to drive a patient to York, Alabama, so that the patient could visit his family during the Christmas holidays.  Orr asserted that Franklin insisted upon accompanying him and the patient on this trip.  Orr alleged that the patient's family offered to compensate him for the expenses incurred during the trip, that he refused the family's offer, but that Franklin accepted the money after Orr

7

refused it.  Orr asserted that Franklin thereafter "insisted"
that they travel to the casinos in Philadelphia, Mississippi.
Orr alleged that, while Franklin gambled in the casinos, he
waited in the car.  Orr further asserted that, during the return
trip to Birmingham, Franklin expressed concern over having
gambled and lost her own money, as well as money set aside for
the TL Unit's recreation fund.  Orr claimed that he gave Franklin
$200 to cover her losses and replace the TL Unit's recreational
funds.

After Orr complained of the above-described circumstances,
HealthSouth forged an investigation into the matter.  Regarding
Orr's allegation that he gave money to Franklin for the purchase
of food, Franklin admitted that she accepted money from Orr, but
she denied that she misappropriated the money or that she failed
to use it as Orr had intended.  Franklin admitted that she
accompanied Orr on the trip to York.  She denied accepting money
from the patient's family, and she denied that she gambled with
money belonging to the TL Unit.  After interviewing witnesses,
HealthSouth determined that the conflicting versions of the
events prevented it from reaching an ultimate decision regarding
the truth of Orr's allegations.  At the conclusion of the
investigation, HealthSouth claims that it documented the
investigation's findings in a memo to Franklin, and it stated:

> At this point, we cannot prove that any of these
> allegations are true or untrue.  However, we do feel it

8

> necessary to remind not only you, but also your
> staff[,] of some applicable policies that need to be
> reviewed: the solicitation and gratuity policy and the
> HealthSouth Standards of Business Conduct.

After the investigation, HealthSouth reviewed its gratuity and
solicitation policy with the TL Unit.  Other than documenting the
investigation's findings in this aforementioned memo, HealthSouth
did not take any disciplinary actions against Franklin.

Franklin contends that she was disciplined on August 8,
1999, when HealthSouth "wrote up" Franklin for three alleged
patient complaints in the TL Unit.  Franklin asserts that
HealthSouth did not investigate these complaints before
disciplining her, and she disputes the truth to these
allegations.  Though Franklin refers to these patient complaints
as sources of disciplinary actions taken against her,
HealthSouth's characterization of these patient complaints is
substantially different.  HealthSouth asserts that Mary Rogers
("Rogers"), RN Case Manager, received and subsequently documented
three patient complaints on August 8, 1999.  Two of these
complaints directly involved technicians under Franklin's
supervision; therefore, Rogers sent her boss, Franklin, and Dan
Johnson ("Johnson"), the second of two individuals to serve as
Director of Patient Care Services during Franklin's tenure, a
copy of the memo documenting these complaints.[4]  After receiving

_____

[4]In July 1999, Franklin and Johnson met to discuss the
recent increase in patient complaints and any contributing
problems in the TL Unit.  The two devised a "work improvement

9

the memo, Franklin investigated the complaints relating to technicians under her supervision; she concluded that the complaints were legitimate, and she reacted appropriately. Franklin claims that the "write-ups" placed in her personnel files were not changed, even though she took efforts to address the patient's complaints.  HealthSouth denies that these patient complaints constituted "write-ups" insofar as they pertain to Franklin, and HealthSouth denies that Franklin received any disciplinary action relating to these patient complaints. HealthSouth contends that this memo was not directed to Franklin personally and that it did not "assign blame, propose or threaten discipline, or take any action whatsoever." (HealthSouth's Br. Supp. Summ. J., at 8.)

Franklin claims that she was again disciplined on August 18, 1999, for "alleged deficiencies in disciplinary actions." (Compl. ¶ 58.)  Franklin disputes the merits of the written disciplinary action and contends that she had complied with the

---

plan" to improve the performance of the TL Unit and to reduce or eliminate patient complaints.  Also in an effort to assist with these improvements, Franklin asked Johnson to inform her of any patient complaints from the TL Unit.
       The work improvement plan provided that "the unlicensed staff will report to Lois Franklin," and that "the licensed staff will have a dual reporting relationship; [sic] to Lois Franklin and to myself."  This plan seems to authorize Franklin to supervise the licensed staff members, which is contrary to the nursing regulations that prohibit licensed nurses from being supervised by non-licensed individuals.

directives given to her in taking disciplinary action against
subordinate employees.  HealthSouth characterizes these facts
differently.  Johnson received copies of attendance "write-ups"
that Franklin had issued to two employees.  These records
contained inaccurate information, and Johnson brought the
inaccuracies to Franklin's attention at the "next unit
improvement meeting."  In this meeting, Johnson "emphasized the
need for accurate information on employee disciplinary forms.  He
also reviewed the proper procedure for disciplinary action when
an employee failed to call in, report off, or appear for work."
(HealthSouth's Br. Supp. Summ. J., at 9.)  HealthSouth contends
that no disciplinary action resulted from this incident.

Franklin claims that she was disciplined on August 31, 1999;
she asserts that she was written up for using poor grammar and
having a limited vocabulary.  HealthSouth claims that this
situation stems from a memo, entitled "Work Improvement Plan Week
Ending 8/31/99," that Johnson sent to Franklin.  The memo stated:

> I interviewed several clients during this period.  One
> client noted that your vocabulary and grammar was
> limited.  The client expressed this concern as [it]
> related to the operations of the unit.  I noted that
> you have not attended the past two Communications
> Meetings (each Monday @ 11:30 a.m.).  It is your
> responsibility to attend these meetings or send a
> representative.

(HealthSouth's Br. Supp. Summ. J., at 9.)  HealthSouth claims
that this memo "was informational in nature and was not
accompanied by any disciplinary action."  (Id. at 9-10.)

11

HealthSouth contends that Franklin "missed a great deal of work" throughout 2000.[5]  By the end of May, Franklin had missed twenty-five full days of work and four partial days.  On November 8, 2000, HealthSouth gave Franklin "a verbal counseling" about her absences.  Franklin asserts that this counseling was inappropriate because her absences were caused by a medical condition.  This counseling provided: "Verbal counseling related to increase in call-ins as a result of sickness.  There has

---

[5]Because Franklin had suffered a stress fracture in her right foot, her physician directed her to temporarily cease working.  Franklin requested and was approved for FMLA leave, pending medical certification.  During Franklin's medical leave, HealthSouth hired Debra Acoff, RN ("Acoff"), an African-American, as Clinical Site Coordinator over the TL.  HealthSouth transferred Acoff to the TL Unit because additional nursing care was needed in the unit to satisfy the demands of patients requiring licensed nursing care and the demands of the medical staff.  HealthSouth further explains its placement of Acoff in the TL Unit:

> As the level of care for TL patients increased, so did the need to staff the unit with licensed personnel who could oversee and perform nursing care, administer medications/treatments, etc.  As a result of and because the work improvement plan was not producing satisfactory results, Johnson decided that the TL Unit needed a full-time RN on staff in the unit.  He based this decision not only on the treating physicians but on his own observations within the unit (Johnson himself was an RN).  As an RN, Acoff was charged with supervising all of the licensed nurses in the unit.  Upon her return from FMLA, [Franklin] retained her title as Residential Manager and continued to supervise the non-licensed staff.

(HealthSouth's Br. Supp. Summ. J., at 10, n.15  (internal citations omitted).)

[been] frequent call-ins in past four months to present date. There needs to be an improvement in attendance or further disciplinary action taken." (HealthSouth's Br. Supp. Summ. J., at 10-11.)

Franklin requested FMLA leave on December 8, 2000.  She subsequently obtained approval from HealthSouth for permanent disability retirement.  Franklin then voluntarily resigned; her last day of actual work at HealthSouth was December 8, 2000.

## II.   DISCUSSION

Title VII provides that it is an unlawful employment practice to discriminate against employees because that employee has made a charge or participated in a proceeding addressing other employment practices made unlawful under Title VII.  This conduct by an employer is unlawful also under § 1981.  Title VII and § 1981 "have the same requirements of proof and use the same analytical framework;" thus, courts have typically addressed the Title VII claim with the understanding that "the analysis applies to the § 1981 claim as well." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  Consequently, the following discussion applies equally to both the Title VII and the § 1981 claims.

The burden-shifting framework enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to retaliation cases.  *Fletcher v. ADT Security Services*, No. 1:99-

CV-0504-CC, 2000 WL 33231616, at *11 (N.D. Ga. Dec. 7, 2000)

(citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).

"To establish a prima facie case of retaliation, a plaintiff must

show that (1) she engaged in a statutorily protected expression;

(2) she suffered an adverse employment action; and (3) there is

some causal relationship between the two events." *Johnson v.*

*Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th

Cir. 2000) (citations omitted).  Once a prima facie case is

established, the burden of production shifts to the employer to

articulate a legitimate, non-discriminatory reason for the

adverse employment action.  *See Meeks v. Computer Associates*

*Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). Upon such a showing,

the plaintiff must demonstrate that the employer's articulated

reasons are pretext for retaliation.  *Id.*

Turning to the question of whether Franklin has established

a prima facie case of retaliation, the court finds that she

engaged in statutorily protected expression to the extent that

Franklin was actually complaining of what she perceived to be

race discrimination in her March letter.  Furthermore, Franklin's

filing of the EEOC charge in November 1999 constitutes protected

expression.  Thus, Franklin satisfies the first element of a

prima facie case of retaliation.  Nonetheless, summary judgment

for HealthSouth is due to be granted.  Considering individually

and collectively the complaint lodged against Franklin by Orr,

14

the complaints by patients regarding Franklin's subordinates, the memoranda to Franklin concerning inaccurate record-keeping on disciplinary forms and her communications problems, the "verbal counseling" regarding Franklin's absences, and the alleged loss of supervisory responsibilities and duties that she suffered, the court cannot find that Franklin was subjected to any adverse employment action.

The Eleventh Circuit defines an adverse employment action as "an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (internal citations omitted). Although actions such as "undeserved negative job evaluations, demotions, disadvantageous transfers, or toleration of harassment" can constitute actionable retaliation, any conduct that falls short of an ultimate employment decision must meet a threshold level of substantiality to be cognizable. *See Graham v. State Farm*, 193 F.3d 1274, 1284 (11th Cir. 1999) (affirming the district court's grant of summary judgment and attaching to its decision the above-quoted opinion of the district court as Appendix A). To be sufficiently substantial, the plaintiff must "show a *serious and material* change in the terms, conditions, or

15

privileges of employment." *Davis v. Town of Lake Park, Florida*,
245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original).
"Whether an action is sufficient to constitute an adverse
employment action for purposes of a retaliation claim must be
determined on a case-by-case basis, using both a subjective and
an objective standard." *Gupta*, 212 F.3d at 587 (internal
citations omitted).

Addressing Franklin's allegations, the court finds that
*Davis v. Town of Lake Park, Florida* is directly on point. *See*
*Davis*, 245 F.3d at 1232. The plaintiff in *Davis*, an African-
American police officer, asserted a retaliation claim under Title
VII, and he alleged that he suffered adverse employment action
because "two corrective job performance memos" were placed in his
personnel file and because he was temporarily removed as the
designated officer-in-charge ("OIC"). The plaintiff argued that
the memos were "tantamount to reprimands" and that the presence
of the memos in his personnel file "jeopardize[d] his career
prospects as a police officer." *Id.* at 1238. He further argued
that the memos were unwarranted, that they "diminished his
prestige and self-esteem," and that they "potentially may
interfere with (unspecified and unexplored) future job
prospects." *Id.* at 1240 (parenthetical in original).

The court found, however, that the memos, though they were
indeed negative assessments of the plaintiff's job performance,

16

did not cause the plaintiff any present or foreseeable future economic injury.  The court noted that the memos expressed concern and criticism regarding one facet of the plaintiff's job performance, described improper conduct by the plaintiff as unacceptable, and warned that "other departmental action" may result if the plaintiff continued performing in a similar manner. *Id.* at 1240.  But because the plaintiff did not suffer a tangible consequence from the memos in the form of loss of pay or benefits, ineligibility for promotions, denial of pay increases, or formal discipline, the court held that the critical and negative memoranda could not serve as a predicate for a retaliation claim.  *Id.* at 1241-1243.

The plaintiff in *Davis* contended that the two instances when he was removed from the OIC position were equivalent to demotions, that these two incidents were otherwise actionable because "they deprived him of supervisory experience that could have yielded future benefits," and that these incidents altered his work assignments.  *Id.* at 1238, 1243.  The plaintiff further argued that these incidents "diminished his prestige."  *Id.* at 1240.  The court disagreed with the plaintiff, and concluded that the "OIC incidents plainly to do not establish adverse employment action."  *Id.* at 1245.  In its discussion of these incidents, the court noted that "applying the adverse action requirement carefully is especially important when the plaintiff's claim is

17

predicated on his disagreement with his employer's reassignment
of tasks.   Courts elsewhere have been reluctant to hold that
changes in job duties amount to adverse employment action when
unaccompanied by any tangible harm."   *Id.* at 1244.

Addressing Franklin's claims for retaliation, the evidence
reflects that Franklin, like the plaintiff in *Davis*, did not
suffer a reduction in salary, a loss of benefits, a denial of
promotion, a change in position, or a change in position or job
title.   Moreover, Franklin was never disciplined in the sense
that she was never formally reprimanded, warned, suspended, or
placed on probation.   Franklin never suffered any **substantial**
repercussions from these incidents.

Though a memo was sent to Franklin to document Orr's
allegations and the findings of the subsequent investigation,
this memo did not cause or lead HealthSouth to impose any
tangible disciplinary actions against Franklin.   The memo even
stated that HealthSouth could not prove or disprove the truth to
Orr's allegations.   More importantly, Franklin admitted in her
deposition that she did not consider the memo to constitute any
form of discipline.   (Franklin's Dep. at 316-17.)   She further
testified that she did not have any complaint regarding the May
12, 1999 memo documenting the findings of HealthSouth's
investigations into Orr's allegations.   (Id. at 315-17.)

The memo by Rogers documenting patient complaints also did

18

not cause or lead HealthSouth to impose any tangible disciplinary actions against Franklin.  Though these memos appear to have led to some kind of disciplinary actions, those actions were not taken against Franklin; rather, Franklin, herself took disciplinary actions against her subordinate technicians who were directly responsible for the patients' complaints.  Though Franklin could view this documentation as reflecting negatively on her job performance as supervisor of the TL Unit and of the technicians, this court, applying an objective standard, declines to adopt such a view.  The memo simply documented the patients' complaints, and it was not directed to Franklin.  Furthermore, Franklin asked Johnson in July 1999 to notify her of any complaints from the TL Unit of which he was made aware; Rogers was merely complying with that request.[6]  She further testified that the memo did not contain anything that was directed to Franklin personally, and that nothing in the memo was disciplinary.  (Id.)  Consequently, the court cannot conclude that the memo regarding patient complaints forms a proper predicate for her retaliation claims.

Just as with the two aforementioned memos, the incident on August 18, 1999, regarding Franklin's record-keeping errors, does not constitute adverse employment action.  Though Franklin

---

[6]Franklin confirmed in her deposition that Rogers was supposed to notify her of such complaints.  (Franklin Dep. at 325-26.)

19

contends that she was "written up," the court cannot detect any hint of discipline when the evidence indicates that Johnson was simply pointing out Franklin's errors on employee disciplinary forms that she had recently completed.  The memo and the meeting seem to be more informational and teaching in nature, with Johnson reviewing the proper procedures for disciplinary action when employees are absent without prior notification.  Neither the memo nor the meeting caused or resulted in the imposition of any tangible disciplinary actions against Franklin.  Franklin agreed in her deposition that her understanding of this incident was that Johnson sought to bring to her attention the fact that her paperwork on disciplinary actions was not being completed satisfactorily and to review with her the proper procedures for documentation.  (Franklin Dep. at 355-56.)  Moreover, when asked whether the August 18 memo was a disciplinary memo, she responded "[n]o, it wasn't."  (Id.)  Thus, because the memo and the meeting did not constitute disciplinary action and because they did not result in discipline, there is no adverse employment action.

The analysis from the above-discussed incidents and memos applies equally to Franklin's contention that she was written up on August 31, 1999, for using poor grammar and having a limited vocabulary.  The memo was not written by Johnson in an effort to discipline Franklin, and it was not written in connection with any sort of punitive purpose; rather, it was written as part of

20

the TL Unit's work improvement plan.  Furthermore, the memo

simply informs Franklin of weaknesses in her communications

skills.  The memo did not accompany, cause, or lead to any

disciplinary action against Franklin.  Consequently, this memo

cannot substantiate a claim for retaliation.

Though Franklin's assertion that the "verbal counseling" she

received on November 8, 2000, more plausibly constitutes adverse

employment action than the previously described incidents, this

incident likewise fails to meet the threshold level of

substantiality.  The document that is being referred to as a

"verbal counseling"[7] warned Franklin that her attendance needed

to improve and that disciplinary action would be taken if she did

not improve.  As with the negative performance evaluations in

*Davis*, which expressed concern over the plaintiff's performance

and warned that departmental action would result if he did not

improve, Franklin's counseling did not result in any economic

injury, and no disciplinary action was ever taken as a result of

the counseling or subsequent to the counseling.  Consequently,

because Franklin did not suffer any tangible employment action,

Franklin's claim that this counseling serves as a predicate for

---

[7]According to HealthSouth, a verbal counseling "is an
opportunity [for the supervisor] to notify an employee of a
problem which, if not corrected, could lead to disciplinary
action" and "express concern about a problem."  (HealthSouth's
Br. Supp. Summ. J., at 28, n.45 (citing Johnson Dep. at 18-19,
21; Smith Dep. at 44).)

her retaliation claim suffers the same ill-fated doom as the aforementioned memos.

The loss of supervisory duties and responsibilities[8] that Franklin allegedly suffered is more akin to a material and substantial change in the terms, conditions, and privileges of Franklin's employment than the previously discussed circumstances. Nonetheless, the court finds that this argument cannot substantiate a claim for retaliation. The alleged loss in her duties did not result in a reduction in pay, a loss of benefits, a deprivation of opportunities for promotion or pay increases, a loss of her title or position, or formal discipline. Consequently, this alleged loss does not constitute adverse employment action. Assuming arguendo that the loss in supervisory responsibilities can substantiate a prima facie case of retaliation, HealthSouth has articulated an unrebutted, legitimate, non-discriminatory reason for this action. Franklin, an unlicensed employee, was prohibited by nursing regulations

_____

[8]HealthSouth maintains in its reply brief that the court should not consider Franklin's assertion, in her brief in response to HealthSouth's motion for summary judgement, that the loss in supervisory responsibilities constitutes adverse employment action. HealthSouth argues that Franklin did not raise this as an issue in her complaint and that she specifically testified in her deposition that she was not predicating her retaliation claims upon the loss of supervisory responsibilities and duties. Because Franklin cannot survive summary judgment even with the court's consideration of the allegation that the loss of supervisory responsibilities constitutes adverse employment action, the court will not address HealthSouth's arguments that Franklin is estopped from making such an argument.

from supervising licensed staff members; she should never have been allowed or given the impression that she was permitted to supervise any licensed TL Unit employees in the first place.

The court simply does not accept Franklin's characterization of the memos and "write-ups" she received as incidents of discipline.  Additionally, the court cannot find that the alleged loss of supervisory responsibilities constitutes adverse employment action.  Furthermore, viewing these incidents collectively, the court finds that they do not meet the threshold level of substantiality.  The Eleventh Circuit's decision in *Davis* mandates the conclusion in this case that these incidents cannot substantiate Franklin's retaliation claims.  Because Franklin has failed to establish a prima facie case of retaliation, further inquiry is not necessary.

### III.   CONCLUSION

For the foregoing reasons, summary judgment for HealthSouth is due to be granted on all claims.  A separate and appropriate order will be entered.

DONE this __19__ day of April 2002.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE